(Slip Opinion) OCTOBER TERM, 2008 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NEGUSIE *v*. HOLDER, ATTORNEY GENERAL

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 07–499.  Argued November 5, 2008—Decided March 3, 2009

The Immigration and Nationality Act (INA) bars an alien from obtaining refugee status in this country if he "assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U. S. C. §1101(a)(42).  This so-called "persecutor bar" applies to those seeking asylum or withholding of removal, but does not disqualify an alien from receiving a temporary deferral of removal under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).  During the time petitioner, an Eritrean national, was forced to work as a prison guard in that country, the prisoners he guarded were persecuted on grounds protected under §1101(a)(42).  After escaping to the United States, petitioner applied for asylum and withholding of removal.  Concluding that he assisted in the persecution of prisoners by working as an armed guard, the Immigration Judge denied relief on the basis of the persecutor bar, but granted deferral of removal under CAT because petitioner was likely to be tortured if returned to Eritrea.  The Board of Immigration Appeals (BIA) affirmed in all respects, holding, *inter alia,* that the persecutor bar applies even if the alien's assistance in persecution was coerced or otherwise the product of duress.  The BIA followed its earlier decisions finding *Fedorenko* v. *United States*, 449 U. S. 490, controlling.  The Fifth Circuit affirmed, relying on its precedent following the same reasoning.

*Held:* The BIA and Fifth Circuit misapplied *Fedorenko* as mandating that whether an alien is compelled to assist in persecution is immaterial for prosecutor-bar purposes.  The BIA must interpret the statute, free from this mistaken legal premise, in the first instance.  Pp. 4–12.

  (a) Under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Coun-*

*cil, Inc.*, 467 U. S. 837, 842–843, the BIA is entitled to deference in interpreting ambiguous INA provisions, see, *e.g., INS* v. *Aguirre-Aguirre*, 526 U. S. 415, 424–425. When the BIA has not spoken on "a matter that statutes place primarily in agency hands," this Court's ordinary rule is to remand to allow "the BIA . . . to address the matter in the first instance in light of its own experience." *INS* v. *Orlando Ventura*, 537 U. S. 12, 16–17. Pp. 4–5.

(b) As there is substance both to petitioner's contention that involuntary acts cannot implicate the persecutor bar because "persecution" presumes moral blameworthiness, and to the Government's argument that the question at issue is answered by the statute's failure to provide an exception for coerced conduct, it must be concluded that the INA has an ambiguity that the BIA should address in the first instance. *Fedorenko*, which addressed a different statute enacted for a different purpose, does not control the BIA's interpretation of this persecutor bar. In holding that voluntariness was not required with respect to such a bar in the Displaced Persons Act of 1948 (DPA), *Fedorenko* contrasted the omission there of the word "voluntary" with the word's inclusion in a related statutory subsection. 449 U. S., at 512. Because Congress did not use the word "voluntary" anywhere in the persecutor bar at issue here, its omission cannot carry the same significance as it did in *Fedorenko.* Moreover, the DPA's exclusion of even those involved in nonculpable, involuntary assistance in persecution was enacted in part to address the Holocaust and its horror, see *id.,* at 511, n. 32, whereas the persecutor bar in this case was enacted as part of the Refugee Act of 1980, which was designed to provide a general rule for the ongoing treatment of all refugees and displaced persons, see, *e.g., Aguirre-Aguirre*, *supra,* at 427. Pp. 5–8.

(c) Whether a BIA determination that the persecution bar contains no exception for coerced conduct would be reasonable, and thus owed *Chevron* deference, is a legitimate question; but it is not presented here. In denying petitioner relief, the BIA recited a rule it has developed in its cases: An alien's motivation and intent are irrelevant to the issue whether he "assisted" in persecution; rather, his actions' objective effect controls. A reading of those decisions confirms that the BIA has not exercised its interpretive authority but, instead, has deemed its interpretation to be mandated by *Fedorenko.* This error prevented the BIA from fully considering the statutory question presented. Its mistaken assumption stems from a failure to recognize the inapplicability of the statutory construction principle invoked in *Fedorenko*, as well as a failure to appreciate the differences in statutory purpose. The BIA is not bound to apply the *Fedorenko* rule to the persecutor bar here at issue. Whether the statute permits such an interpretation based on a different course of reasoning must be

Syllabus

determined in the first instance by the agency. Pp. 8–10.

　(d) Because the BIA has not yet exercised its *Chevron* discretion to interpret the statute, the proper course is to remand to it for additional investigation or explanation, *e.g., Gonzales* v. *Thomas*, 547 U. S. 183, 186, allowing it to bring its expertise to bear on the matter, evaluate the evidence, make an initial determination, and thereby help a court later determine whether its decision exceeds the leeway that the law provides, *e.g., id.,* at 186–187. Pp. 10–12.

231 Fed. Appx. 325, reversed and remanded.

　KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, SOUTER, GINSBURG, and ALITO, JJ., joined. SCALIA, J., filed a concurring opinion, in which ALITO, J., joined. STEVENS, J., filed an opinion concurring in part and dissenting in part, in which BREYER, J., joined. THOMAS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

No. 07–499

————

## DANIEL GIRMAI NEGUSIE, PETITIONER *v.* ERIC H. HOLDER, JR., ATTORNEY GENERAL

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[March 3, 2009]

JUSTICE KENNEDY delivered the opinion of the Court.

An alien who fears persecution in his homeland and seeks refugee status in this country is barred from obtaining that relief if he has persecuted others.

> "The term 'refugee' does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion."  Immigration and Nationality Act (INA), §101, 66 Stat. 166, as added by Refugee Act of 1980, §201(a), 94 Stat. 102–103, 8 U. S. C. §1101(a)(42).

This so-called "persecutor bar" applies to those seeking asylum, §1158(b)(2)(A)(i), or withholding of removal, §1231(b)(3)(B)(i).  It does not disqualify an alien from receiving a temporary deferral of removal under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100–20, p. 20, 1465 U. N. T. S. 85; 8 CFR §1208.17(a) (2008).

In this case the Board of Immigration Appeals (BIA)

determined that the persecutor bar applies even if the alien's assistance in persecution was coerced or otherwise the product of duress. In so ruling the BIA followed its earlier decisions that found *Fedorenko* v. *United States*, 449 U. S. 490 (1981), controlling. The Court of Appeals for the Fifth Circuit, in affirming the agency, relied on its precedent following the same reasoning. We hold that the BIA and the Court of Appeals misapplied *Fedorenko*. We reverse and remand for the agency to interpret the statute, free from the error, in the first instance.

I

Petitioner in this Court is Daniel Girmai Negusie, a dual national of Eritrea and Ethiopia, his father having been a national of the former and his mother of the latter. Born and educated in Ethiopia, he left there for Eritrea around the age of 18 to see his mother and find employment. The year was 1994. After a few months in Eritrea, state officials took custody of petitioner and others when they were attending a movie. He was forced to perform hard labor for a month and then was conscripted into the military for a time. War broke out between Ethiopia and Eritrea in 1998, and he was conscripted again.

When petitioner refused to fight against Ethiopia, his other homeland, the Eritrean Government incarcerated him. Prison guards punished petitioner by beating him with sticks and placing him in the hot sun. He was released after two years and forced to work as a prison guard, a duty he performed on a rotating basis for about four years. It is undisputed that the prisoners he guarded were being persecuted on account of a protected ground— *i.e.*, "race, religion, nationality, membership in a particular social group, or political opinion." 8 U. S. C. §1101(a)(42). Petitioner testified that he carried a gun, guarded the gate to prevent escape, and kept prisoners from taking showers and obtaining fresh air. He also guarded prisoners to

make sure they stayed in the sun, which he knew was a form of punishment. He saw at least one man die after being in the sun for more than two hours. Petitioner testified that he had not shot at or directly punished any prisoner and that he helped prisoners on various occasions. Petitioner escaped from the prison and hid in a container, which was loaded on board a ship heading to the United States. Once here he applied for asylum and withholding of removal.

In a careful opinion the Immigration Judge, W. Wayne Stogner, found that petitioner's testimony, for the most part, was credible. He concluded that petitioner assisted in persecution by working as an armed guard. The judge determined that although "there's no evidence to establish that [petitioner] is a malicious person or that he was an aggressive person who mistreated the prisoners, . . . the very fact that he helped [the government] in the prison compound where he had reason to know that they were persecuted constitutes assisting in the persecution of others and bars [petitioner] from" obtaining asylum or withholding of removal. App. to Pet. for Cert. 16a–17a (citing, *inter alia*, *Fedorenko, supra*). The judge, however, granted deferral of removal under CAT because petitioner was likely to be tortured if returned to Eritrea.

The BIA affirmed the denial of asylum and withholding. It noted petitioner's role as an armed guard in a facility where "prisoners were tortured and left to die out in the sun . . . on account of a protected ground." App. to Pet. for Cert. 6a. The BIA held that "[t]he fact that [petitioner] was compelled to participate as a prison guard, and may not have actively tortured or mistreated anyone, is immaterial." *Ibid.* That is because "'an alien's motivation and intent are irrelevant to the issue of whether he "assisted" in persecution . . . [I]t is the objective effect of an alien's actions which is controlling.'" *Ibid.* (quoting *Matter of Fedorenko*, 19 I. & N. Dec. 57, 69 (BIA 1984)). The BIA

also affirmed the grant of deferral of removal under CAT.

On petition for review the Court of Appeals agreed with the BIA that whether an alien is compelled to assist in persecution is immaterial for persecutor-bar purposes. App. to Pet. for Cert. 2a (citing *Fedorenko*, 449 U. S., at 512, n. 34). We granted certiorari. 552 U. S. ___ (2008).

## II

Consistent with the rule in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 842–843 (1984), the BIA is entitled to deference in interpreting ambiguous provisions of the INA. The question here is whether an alien who was compelled to assist in persecution can be eligible for asylum or withholding of removal. We conclude that the BIA misapplied our precedent in *Fedorenko* as mandating that an alien's motivation and intent are irrelevant to the issue whether an alien assisted in persecution. The agency must confront the same question free of this mistaken legal premise.

## A

It is well settled that "principles of *Chevron* deference are applicable to this statutory scheme." *INS* v. *Aguirre-Aguirre*, 526 U. S. 415, 424 (1999). Congress has charged the Attorney General with administering the INA, and a "ruling by the Attorney General with respect to all questions of law shall be controlling." 8 U. S. C. §1103(a)(1). Judicial deference in the immigration context is of special importance, for executive officials "exercise especially sensitive political functions that implicate questions of foreign relations." *INS* v. *Abudu*, 485 U. S. 94, 100 (1988). The Attorney General's decision to bar an alien who has participated in persecution "may affect our relations with [the alien's native] country or its neighbors. The judiciary is not well positioned to shoulder primary responsibility for assessing the likelihood and importance of such diplo-

matic repercussions." *Aguirre-Aguirre*, 526 U. S., at 425.

The Attorney General, in turn, has delegated to the BIA the "'discretion and authority conferred upon the Attorney General by law'" in the course of "'considering and determining cases before it.'" *Ibid.* (quoting 8 CFR §3.1(d)(1) (1998)). As a consequence, "the BIA should be accorded *Chevron* deference as it gives ambiguous statutory terms 'concrete meaning through a process of case-by-case adjudication.'" *Aguirre-Aguirre, supra*, at 425 (quoting *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 448–449 (1987)). When the BIA has not spoken on "a matter that statutes place primarily in agency hands," our ordinary rule is to remand to "giv[e] the BIA the opportunity to address the matter in the first instance in light of its own experience." *INS* v. *Orlando Ventura*, 537 U. S. 12, 16–17 (2002) *(per curiam)*.

B

The parties disagree over whether coercion or duress is relevant in determining if an alien assisted or otherwise participated in persecution. As there is substance to both contentions, we conclude that the statute has an ambiguity that the agency should address in the first instance.

Petitioner argues that the statute's plain language makes clear that involuntary acts do not implicate the persecutor bar because "'persecution'" presumes moral blameworthiness. Brief for Petitioner 23–28. He invokes principles of criminal culpability, concepts of international law, and the rule of lenity. *Id.*, at 28–45. Those arguments may be persuasive in determining whether a particular agency interpretation is reasonable, but they do not demonstrate that the statute is unambiguous. Petitioner all but conceded as much at argument in this Court when he indicated that the BIA has discretion to construe the duress defense in either a narrow or a broad way. Tr. of Oral Arg. 20–24.

The Government, on the other hand, asserts that the

statute does not allow petitioner's construction. "The statutory text," the Government says, "directly answers that question: there is no exception" for conduct that is coerced because Congress did not include one. Brief for Respondent 11. We disagree. The silence is not conclusive. The question is whether the statutory text mandates that coerced actions must be deemed assistance in persecution. On that point the statute, in its precise terms, is not explicit. Nor is this a case where it is clear that Congress had an intention on the precise question at issue. Cf. *Cardoza-Fonseca*, *supra*, at 448–449.

The Government, like the BIA and the Court of Appeals, relies on *Fedorenko* to provide the answer. This reliance is not without some basis, as the Court there held that voluntariness was not required with respect to another persecutor bar. 449 U. S., at 512. To the extent, however, the Government deems *Fedorenko* to be controlling, it is in error.

In *Fedorenko*, the Court interpreted the Displaced Persons Act of 1948 (DPA), 62 Stat. 1009. The DPA was enacted "to enable European refugees driven from their homelands by the [second world] war to emigrate to the United States without regard to traditional immigration quotas." 449 U. S., at 495. Section 2(b) of the DPA provides relief to "any displaced person or refugee as defined in Annex I of the Constitution of the International Refugee Organization" of the United Nations (IRO Constitution). 62 Stat. 1009. The IRO Constitution, as codified by Congress, excludes any individual "who can be shown: (a) to have assisted the enemy in persecuting civil populations of countries, Members of the United Nations; or (b) to have voluntarily assisted the enemy forces since the outbreak of the second world war in their operations against the United Nations." Annex I, Part II, §2, 62 Stat. 3051–3052.

The *Fedorenko* Court held that "an individual's service as a concentration camp armed guard—whether voluntary

or involuntary—made him ineligible for a visa" under §2(a) of the IRO Constitution. 449 U. S., at 512. That Congress did not adopt a voluntariness requirement for §2(a), the Court noted, "is plain from comparing §2(a) with §2(b), which excludes only those individuals who '*voluntarily* assisted the enemy forces.'" *Ibid.* The Court relied on the principle of statutory construction that "the deliberate omission of the word 'voluntary' from §2(a) compels the conclusion that the statute made *all* those who assisted in persecution of civilians ineligible for visas." *Ibid.*

*Fedorenko* does not compel the same conclusion in the case now before us. The textual structure of the statute in *Fedorenko* ("voluntary" is in one subsection but not the other) is not part of the statutory framework considered here. Congress did not use the word "voluntary" in any subsection of the persecutor bar, so its omission cannot carry the same significance.

The difference between the statutory scheme in *Fedorenko* and the one here is confirmed when we "'look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.'" *Dada* v. *Mukasey*, 554 U. S. 1, \_\_\_ (2008) (slip op., at 13) (quoting *Gozlon-Peretz* v. *United States*, 498 U. S. 395, 407 (1991)). Both statutes were enacted to reflect principles set forth in international agreements, but the principles differ in significant respects.

As discussed, Congress enacted the DPA in 1948 as part of an international effort to address individuals who were forced to leave their homelands during and after the second World War. *Fedorenko, supra*, at 495. The DPA excludes those who "voluntarily assisted the enemy forces since the outbreak of the second world war," 62 Stat. 3052, as well as all who "assisted the enemy in persecuting civil populations of countries," *id.*, at 3051. The latter exclusion clause makes no reference to culpability. The exclusion of even those involved in nonculpable, involuntary

assistance in Nazi persecution, as an expert testified in *Fedorenko*, may be "'[b]ecause the crime against humanity that is involved in the concentration camp puts it into a different category.'" 449 U. S., at 511, n. 32.

The persecutor bar in this case, by contrast, was enacted as part of the Refugee Act of 1980. Unlike the DPA, which was enacted to address not just the post war refugee problem but also the Holocaust and its horror, the Refugee Act was designed to provide a general rule for the ongoing treatment of all refugees and displaced persons. As this Court has twice recognized, "'one of Congress' primary purposes' in passing the Refugee Act was to implement the principles agreed to in the 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U. S. T. 6224, T. I. A. S. 6577 (1968)," as well as the "United Nations Convention Relating to the Status of Refugees, 189 U. N. T. S. 150 (July 28, 1951), reprinted in 19 U. S. T. 6259." *Aguirre-Aguirre*, 526 U. S., at 427 (quoting *Cardoza-Fonseca*, 480 U. S., at 436–437).

These authorities illustrate why *Fedorenko*, which addressed a different statute enacted for a different purpose, does not control the BIA's interpretation of this persecutor bar. Whatever weight or relevance these various authorities may have in interpreting the statute should be considered by the agency in the first instance, and by any subsequent reviewing court, after our remand.

C

The Government argues that "if there were any ambiguity in the text, the Board's determination that the bar contains no such exception is reasonable and thus controlling." Brief for Respondent 11. Whether such an interpretation would be reasonable, and thus owed *Chevron* deference, is a legitimate question; but it is not now before us. The BIA deemed its interpretation to be mandated by *Fedorenko*, and that error prevented it from a full consid-

eration of the statutory question here presented.

In denying relief in this case the BIA recited a rule that has developed in its own case law in reliance on *Fedorenko:* "[A]n alien's motivation and intent are irrelevant to the issue of whether he 'assisted' in persecution . . . [I]t is the objective effect of an alien's actions which is controlling." App. to Pet. for Cert. 6a. The rule is based on three earlier decisions: *Matter of Laipenieks*, 18 I. & N. Dec. 433 (1983); *Matter of Fedorenko*, 19 I. & N. Dec. 57; and *Matter of Rodriguez-Majano*, 19 I. & N. Dec. 811 (1988).

In *Matter of Laipenieks*, the BIA applied the Court's *Fedorenko* analysis of the DPA to a different postwar statute, which provided for the deportation of anyone associated with the Nazis who "ordered, incited, assisted, or otherwise participated" in persecution based on a protected ground. 8 U. S. C. §1182(a)(3)(E)(i). Finding no agency or judicial decision on point, the BIA relied on *Fedorenko*. It recognized that the unique structure of the *Fedorenko* statute was not present in §1182(a)(3)(E)(i), but the BIA nevertheless adopted wholesale the *Fedorenko* rule: "[A]s in *Fedorenko*, . . . the plain language of [§1182(a)(3)(E)(i)] mandates a literal interpretation, and the omission of an intent element compels the conclusion that [§1182(a)(3)(E)(i)] makes all those who assisted in the specific persecution deportable." 18 I. & N. Dec., at 464. In other words, "particular motivations or intent . . . is not a relevant factor." *Ibid.*

The second decision, *Matter of Fedorenko*, also dealt with §1182(a)(3)(E)(i), and it involved the same alien whose citizenship was revoked by this Court's *Fedorenko* decision. This time the agency sought to deport him. Fedorenko responded by requesting suspension of deportation. He argued that, unlike the DPA's bar on any assistance—voluntary or involuntary—in persecution, see *Fedorenko*, 449 U. S., at 512, the text and structure of §1182(a)(3)(E)(i) required deportation only of those who

voluntarily assisted in persecuting others. The BIA re-
jected that distinction, noting that it was foreclosed by
*Matter of Laipenieks:* "It may be, as [Fedorenko] argues,
that his service at Treblinka was involuntary. . . . We
need not resolve the issue, however, because as a matter of
law [Fedorenko's] motivations for serving as a guard at
Treblinka are immaterial to the question of his deportabil-
ity under" §1182(a)(3)(E)(i). 19 I. & N. Dec., at 69–70.

Later, the BIA applied this Court's *Fedorenko* rule to
the persecutor bar that is at issue in the present case. In
*Matter of Rodriguez-Majano*, the BIA granted relief be-
cause the alien's coerced conduct as a guerrilla was not
persecution based on a protected ground. 19 I. & N. Dec.,
at 815–816. Nevertheless, in reaching its conclusion the
BIA incorporated without additional analysis the *Fe-
dorenko* rule as applied in *Matter of Laipenieks* and reiter-
ated in *Matter of Fedorenko.* 19 I. & N. Dec., at 814–815.
The BIA reaffirmed that "[t]he participation or assistance
of an alien in persecution need not be of his own volition to
bar him from relief." *Id.*, at 814 (citing *Fedorenko*, 449
U. S. 490).

Our reading of these decisions confirms that the BIA
has not exercised its interpretive authority but, instead,
has determined that *Fedorenko* controls. This mistaken
assumption stems from a failure to recognize the inappli-
cability of the principle of statutory construction invoked
in *Fedorenko*, as well as a failure to appreciate the differ-
ences in statutory purpose. The BIA is not bound to apply
the *Fedorenko* rule that motive and intent are irrelevant
to the persecutor bar at issue in this case. Whether the
statute permits such an interpretation based on a differ-
ent course of reasoning must be determined in the first
instance by the agency.

## III

Having concluded that the BIA has not yet exercised its

*Chevron* discretion to interpret the statute in question, """"the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.""" *Gonzales* v. *Thomas*, 547 U. S. 183, 186 (2006) *(per curiam)* (quoting *Ventura*, 537 U. S., at 16, in turn quoting *Florida Power & Light Co.* v. *Lorion*, 470 U. S. 729, 744 (1985)). This remand rule exists, in part, because "ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps . . . involves difficult policy choices that agencies are better equipped to make than courts." *National Cable & Telecommunications Assn.* v. *Brand X Internet Services*, 545 U. S. 967, 980 (2005).

JUSTICE STEVENS would have the Court provide a definite answer to the question presented and then remand for further proceedings. That approach, however, is in tension with the "ordinary 'remand' rule." *Ventura, supra*, at 18; see also *Cajun Elec. Power Cooperative, Inc.* v. *FERC*, 924 F. 2d 1132, 1136 (CADC 1991) (opinion for the Court by Silberman, J., joined by R. Ginsburg and Thomas, JJ.) ("[I]f an agency erroneously contends that Congress' intent has been clearly expressed and has rested on that ground, we remand to require the agency to consider the question afresh in light of the ambiguity we see"). *Thomas* is illustrative. There, the agency had not determined whether a family may constitute a social group for the purposes of refugee status. The Ninth Circuit held that the family can constitute a protected social group and that the particular family at issue did qualify. 547 U. S., at 184–185. The Solicitor General sought review in this Court on "whether the Ninth Circuit erred in holding, in the first instance and without prior resolution of the questions by the relevant administrative agency, that members of a family can and do constitute a particular social group, within the meaning of the Act." *Id.*, at 185 (internal quo-

tation marks omitted).  He argued that the Ninth Circuit's
decision violated the *Ventura* ordinary remand rule.  We
agreed and summarily reversed.  547 U. S., at 184–185

   *Ventura* and *Thomas* counsel a similar result here.
Because of the important differences between the statute
before us and the one at issue in *Fedorenko*, we find it
appropriate to remand to the agency for its initial deter-
mination of the statutory interpretation question and its
application to this case.  The agency's interpretation of the
statutory meaning of "persecution" may be explained by a
more comprehensive definition, one designed to elaborate
on the term in anticipation of a wide range of potential
conduct; and that expanded definition in turn may be
influenced by how practical, or impractical, the standard
would be in terms of its application to specific cases.
These matters may have relevance in determining
whether its statutory interpretation is a permissible one.

   As the Court said in *Ventura* and reiterated in *Thomas*,
"'[t]he agency can bring its expertise to bear upon the
matter; it can evaluate the evidence; it can make an initial
determination; and, in doing so, it can, through informed
discussion and analysis, help a court later determine
whether its decision exceeds the leeway that the law
provides.'"  547 U. S., at 186–187 (quoting *Ventura, supra*,
at 17).  If the BIA decides to adopt a standard that consid-
ers voluntariness to some degree, it may be prudent and
necessary for the Immigration Judge to conduct additional
factfinding based on the new standard.  Those determina-
tions are for the agency to make in the first instance.

*           *           *

   We reverse the judgment of the Court of Appeals and
remand the case for further proceedings consistent with
this opinion.

                                        *It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 07–499

_____

## DANIEL GIRMAI NEGUSIE, PETITIONER *v.* ERIC H. HOLDER, JR., ATTORNEY GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[March 3, 2009]

JUSTICE SCALIA, with whom JUSTICE ALITO joins, concurring.

I agree with the Court that "the statute has an ambiguity," *ante*, at 5, with respect to whether an alien who was coerced to assist in persecution is barred from obtaining asylum in the United States. I agree that the agency is entitled to answer that question. *Ibid.* See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843 (1984). And I agree that a remand is in order, to give the agency an opportunity to clarify whether its affirmative answer was premised on an erroneous view that this Court's decision in *Fedorenko* v. *United States*, 449 U. S. 490 (1981), compelled it. *Ante*, at 11.

I would not agree to remand if I did not think that the agency has the option of adhering to its decision. The majority appears to leave that question undecided, *ante*, at 5 (reserving whether "a particular agency interpretation is reasonable"); two Justices forthrightly disagree and would require the agency to recognize at least some sort of duress exception, *post*, at 7 (STEVENS, J., concurring in part and dissenting in part).

But good reasons for the agency's current practice exist—reasons adequate to satisfy the requirement that an agency act reasonably in choosing among various possible constructions of an ambiguous statute. The statute does

not mandate the rule precluding the duress defense but does not foreclose it either; the agency is free to retain that rule so long as the choice to do so is soundly reasoned, not based on irrelevant or arbitrary factors (like the *Fedorenko* precedent).

The primary contention to the contrary is, in short, that barring aliens who persecuted under duress would punish purely "nonculpable" conduct. That argument suffers from at least three unjustified leaps of logic.

First, it implicitly adopts a view of "culpability" that is neither the only view nor one necessarily applicable here. The culpability of one who harms another under coercion is, and has always been, a subject of intense debate, raising profound questions of moral philosophy and individual responsibility. (The so-called "Nuremberg defense" comes readily to mind.) At common law, duress was not an accepted defense to intentional killing, see 2 W. LaFave, Substantive Criminal Law §9.7(b), pp. 74–75 (2d ed. 2003); and in modern times, some states do not allow it as a defense to lesser crimes, see *id.*, at 81–82, and n. 50. Notably, there is no historical support for the duress defense when a soldier follows a military order he knows to be unlawful. *Id.*, §9.7(g), at 86; see also, *e.g.*, *Axtell's Case*, Kel. J. 13, 84 Eng. Rep. 1060 (1660); *Prosecutor* v. *Erdemović*, [1997] 2 ICTY Jud. Rep. 1610, 1635 (Int'l Crim. Trib. for Former Yugoslavia). It is therefore far from clear that precluding a duress defense here would, as petitioner alleges, "disregard principles of blame . . . 'universal and persistent' in American law." Brief for Petitioner 32 (quoting *Morissette* v. *United States*, 342 U. S. 246, 250 (1952)). All of this suggests that those who are coerced to commit wrong are at least *sometimes* "culpable" enough to be treated as criminals.

More importantly, this is not a criminal matter. This Court has long understood that an "order of deportation is not a punishment for crime." *Fong Yue Ting* v. *United*

*States*, 149 U. S. 698, 730 (1893).  Asylum is a benefit accorded by grace, not by entitlement, and withholding that benefit from all who have intentionally harmed others—whether under coercion or not—is not unreasonable.

Second, petitioner assumes that the persecutor bar must have been intended merely to punish wrongdoing.  But in the context of immigration law, "culpability" as a relevant factor in determining admissibility is only one facet of a more general consideration: desirability.  And there may well be reasons to think that those who persecuted others, even under duress, would be relatively undesirable as immigrants.  If, for example, the asylum laws grant entry to those who suffered the persecution, might it not be imprudent to also grant entry to the coerced persecutor, who may end up living in the same community as one of his victims?  The Nation has a legitimate interest in preventing the importation of ethnic strife from remote parts of the world, and the agency may resolve the statutory ambiguity in a way that safeguards that interest.

Finally, *even if* culpability is the only relevant factor, and *even if* a narrow, criminal-law based view of culpability is the authoritative one, a bright-line rule excluding all persecutors—whether acting under coercion or not—might *still* be the best way for the agency to effectuate the statutory scheme.  See generally Cox & Posner, Second-Order Structure of Immigration Law, 59 Stan. L. Rev. 809 (2007).  Immigration judges already face the overwhelming task of attempting to recreate, by a limited number of witnesses speaking through (often poor-quality) translation, events that took place years ago in foreign, usually impoverished countries.  See *Dia* v. *Ashcroft*, 353 F. 3d 228, 261–262 (CA3 2003) (en banc) (Alito, J., concurring in part and dissenting in part).  Adding on top of that the burden of adjudicating claims of duress and coercion, which are extremely difficult to corroborate and necessarily pose questions of degree that require intensely fact-

bound line-drawing, would increase the already inherently high risk of error. And the *cost* of error (viz., allowing *un*coerced persecutors to remain in the country permanently) might reasonably be viewed by the agency as significantly greater than the cost of overinclusion under a bright-line rule (viz., denial of asylum to some coerced persecutors—who might anyway be entitled to protection under the Convention Against Torture, which includes no analogous persecutor bar).

It is worth noting that although the agency's "objective effects" approach to the statute would seem to sweep beyond the duress scenario to encompass even an alien who had no idea that his actions would "objectively" assist in persecution, see *Castañeda-Castillo* v. *Gonzales*, 488 F. 3d 17, 20 (CA1 2007) (en banc), there is no reason why the agency cannot consider questions of *knowledge* separate and apart from questions of *duress*. Both can be said to relate to the mental state of the persecutor,* but they present different problems which can be grappled with separately. The agency need not provide an "all-embracing answer," *ibid.*, in the present case. It may evaluate problems one by one as they arise, and whatever it might decide about an unknowing persecutor is irrelevant to petitioner, who knew exactly what he was doing.

To be clear, I do not endorse any particular rule. It is to agency officials, not to the Members of this Court, that Congress has given discretion to choose among permissible interpretations of the statute. They deserve to be told clearly whether we are serious about allowing them to exercise that discretion, or are rather firing a warning shot across the bow.

———————

*The rationale for the duress defense, however, is conventionally "not that the defendant . . . somehow loses his mental capacity to commit the crime in question," but rather that "even though he has done the act the crime requires and has the mental state which the crime requires, his conduct . . . is excused." 2 LaFave, *supra*, §9.7(a), at 73.

# SUPREME COURT OF THE UNITED STATES

No. 07–499

DANIEL GIRMAI NEGUSIE, PETITIONER *v.* ERIC
H. HOLDER, JR., ATTORNEY GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[March 3, 2009]

JUSTICE STEVENS, with whom JUSTICE BREYER joins,
concurring in part and dissenting in part.

The narrow question of statutory construction presented
by this case is whether the so-called "persecutor bar," 8
U. S. C. §§1101(a)(42), 1158(b)(2)(A)(i), 1231(b)(3)(B),
disqualifies from asylum or withholding of removal an
alien whose conduct was coerced or otherwise the product
of duress. If the answer to that threshold question is "no,"
courts should defer to the Attorney General's evaluation of
particular circumstances that may or may not establish
duress or coercion in individual cases. But the threshold
question the Court addresses today is a "pure question of
statutory construction for the courts to decide." *INS* v.
*Cardoza-Fonseca*, 480 U. S. 421, 446 (1987). For that
reason, while I agree with the Court's cogent explanation
of why its misguided decision in *Fedorenko* v. *United
States*, 449 U. S. 490 (1981), does not govern our interpre-
tation of the persecutor bar, I would provide a definite
answer to the question presented and then remand for
further proceedings.

## I

Judicial deference to agencies' views on statutes they
administer was not born in *Chevron U. S. A. Inc.* v. *Natu-
ral Resources Defense Council, Inc.*, 467 U. S. 837 (1984),

nor did the "singularly judicial role of marking the boundaries of agency choice," *Young* v. *Community Nutrition Institute*, 476 U. S. 974, 988 (1986) (STEVENS, J., dissenting), die with that case. In the years before *Chevron*, this Court recognized that statutory interpretation is a multifaceted enterprise, ranging from a precise construction of statutory language to a determination of what policy best effectuates statutory objectives. We accordingly acknowledged that a complete interpretation of a statutory provision might demand both judicial construction and administrative explication. *E.g.*, *NLRB* v. *Hearst Publications, Inc.*, 322 U. S. 111 (1944) (construing the term "employee" in the National Labor Relations Act but deferring to the National Labor Relations Board's finding that newsboys were employees); see Nathanson, Administrative Discretion in the Interpretation of Statutes, 3 Vand. L. Rev. 470 (1950).

*Chevron* adhered to this approach. There, we recognized that the Clean Air Act did not define "stationary source," 42 U. S. C. §7502(b)(6) (1982 ed.), but rather implicitly delegated to the Environmental Protection Agency (EPA) the policy question whether States could treat entire plants or only their discrete pollution-emitting devices as sources of pollution for purposes of the Act's permit program. Congress left a gap for the agency to fill, and the agency brought its expertise, political acuity, and information-gathering abilities to bear in doing so. See *Chevron*, 467 U. S., at 865–866.[1] In keeping with precedent, see *id.*,

_____

[1] Notably, the EPA cast its activity not as statutory construction but as public administration; its rulemaking sought to achieve policy goals, such as reducing regulatory complexity and promoting plant modernization. See 46 Fed. Reg. 50766 (1981). To be sure, the EPA argued that its regulation defining "stationary source" as an entire plant was permissible under the Clean Air Act, but the agency treated its rulemaking as a matter of fashioning sound policy, not of discerning the meaning of "stationary source" in the statute.

at 843–845, and nn. 9, 11–14, our opinion reaffirmed both that "[t]he judiciary is the final authority on issues of statutory construction," *id.*, at 843, n. 9, and that courts should defer to an agency's reasonable formulation of policy in response to an explicit or implicit congressional delegation of authority. The *Chevron* framework thus accounts for the different institutional competencies of agencies and courts: Courts are expert at statutory construction, while agencies are expert at statutory implementation. That the distinction can be subtle does not lessen its importance.

In the 25 years since *Chevron* was decided, this Court has continued to recognize that courts and agencies play complementary roles in the project of statutory interpretation. We have repeatedly held that "ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion." *National Cable & Telecommunications Assn.* v. *Brand X Internet Services*, 545 U. S. 967, 980 (2005). But even when confronted with a statute that involves a degree of ambiguity—as most statutes do—we have not abdicated our judicial role. The fact that Congress has left a gap for the agency to fill means that courts should defer to the agency's reasonable gap-filling decisions, not that courts should cease to mark the bounds of delegated agency choice.[2]

In cases involving agency adjudication, we have sometimes described the court's role as deciding pure questions of statutory construction and the agency's role as applying law to fact. See, *e.g.*, *Cardoza-Fonseca*, 480 U. S. 421; *NLRB* v. *Food & Commercial Workers*, 484 U. S. 112

---

[2] Cf. *United States* v. *Mead Corp.*, 533 U. S. 218, 236–238 (2001); *Barnhart* v. *Walton*, 535 U. S. 212, 222 (2002) (noting that *Mead* "indicated that whether a court should give *[Chevron]* deference depends in significant part upon the interpretive method used and the nature of the question at issue").

(1987); see also *Republic of Austria* v. *Altmann*, 541 U. S. 677, 701–702 (2004).  While this phrasing is peculiar to the adjudicatory context, the principle applies to *Chevron*'s domain more broadly.  In the context of agency rulemaking, for instance, we might distinguish between pure questions of statutory interpretation and policymaking, or between central legal issues and interstitial questions. See *Barnhart* v. *Walton*, 535 U. S. 212, 222 (2002).[3]  The label is immaterial.  What matters is the principle: Certain aspects of statutory interpretation remain within the purview of the courts, even when the statute is not entirely clear, while others are properly understood as delegated by Congress to an expert and accountable administrative body.  Statutory language may thus admit of both judicial construction and agency exposition.

## II

Two of this Court's cases construing the Immigration and Nationality Act (INA), 66 Stat. 166, 8 U. S. C. §1101 *et seq.*, illustrate the proper division of responsibility between courts and agencies and highlight when *Chevron* deference is appropriate and when it is not.  In *Cardoza-Fonseca*, the question was whether the standard of INA §243(h), 8 U. S. C. §1253(h) (1982 ed.), which requires an alien to show that she is more likely than not to be subject to persecution if she is deported, also governs applications for asylum under §208(a), 8 U. S. C. §1158(a) (1982 ed.), which authorizes the Attorney General to grant asylum to an alien who has a well-founded fear of persecution in her home country.  After considering the INA's language, its legislative history, and the United Nations Protocol that

──────────

[3] The Administrative Procedure Act draws a similar distinction in providing that courts "shall decide all relevant questions of law [and] interpret constitutional and statutory provisions" but shall review "agency action, findings, and conclusions" under the arbitrary and capricious/abuse of discretion standard.  5 U. S. C. §706.

Congress had implemented, the Court determined that the two standards are not the same.

In so holding, we decisively rejected the Government's contention, echoed by JUSTICE SCALIA's concurrence in the judgment, that the Board of Immigration Appeals' (BIA) interpretation of the statute merited deference under our then-recent decision in *Chevron*. "The question whether Congress intended the two standards to be identical is a pure question of statutory construction for the courts to decide," we stated. 480 U. S., at 446. We therefore did not defer to the BIA's interpretation of the two standards as equivalent but instead employed traditional tools of statutory construction and "concluded that Congress did not intend the two standards to be identical." *Ibid.*[4]

Importantly, we recognized that *Chevron* deference need not be an all-or-nothing venture. Even after the question of the standards' equivalency was resolved, there remained the question of their application. We explained, "The narrow legal question whether the two standards are the same is, of course, quite different from the question of interpretation that arises in each case in which the agency is required to apply either or both standards to a particular set of facts." 480 U. S., at 448. And we noted that applying the INA was a task particularly suited to the agency's unique competencies: "There is obviously some ambiguity in a term like 'well-founded fear' which can only

———————

[4] JUSTICE SCALIA objected in particular to the majority's holding that pure questions of statutory construction are for the courts, not agencies, to decide; he insisted this was unfaithful to *Chevron*, "since in *Chevron* the Court deferred to the Environmental Protection Agency's abstract interpretation of the phrase 'stationary source.'" 480 U. S., at 455 (opinion concurring in judgment). The majority rejected JUSTICE SCALIA's argument, recognizing that *Chevron* involved an agency's complex policy judgment about how to fill a statutory gap, not a pure question of statutory construction. See 480 U. S., at 445–448, and n. 29 (quoting extensively from *Chevron*).

be given concrete meaning through a process of case-by-case adjudication.  In that process of filling '"any gap left, implicitly or explicitly by Congress,"' the courts must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program."  *Ibid.* (quoting *Chevron*, 467 U. S., at 843, in turn quoting *Morton* v. *Ruiz*, 415 U. S. 199, 231 (1974)).

In *INS* v. *Aguirre-Aguirre*, 526 U. S. 415 (1999), the Court encountered just the type of agency decision *Cardoza-Fonseca* indicated would warrant *Chevron* deference. The BIA had denied withholding of deportation because it found that the respondent had "committed a serious non-political crime" before he entered the United States, 8 U. S. C. §1253(h)(2)(C) (1994 ed.).  The Court of Appeals reversed the agency's decision and required it to supplement its balancing test with specific additional factors (such as whether the respondent's acts were grossly out of proportion to their objective and whether the acts were politically necessary and successful).

We reversed the Court of Appeals, concluding that *Chevron* deference should be accorded to the BIA "as it gives ambiguous statutory terms 'concrete meaning through a process of case-by-case adjudication.'"  526 U. S., at 425 (quoting *Cardoza-Fonseca*, 480 U. S., at 448).  The BIA's formulation of a test to apply the statutory standard in individual cases and its application of that test in respondent's case were precisely the sort of agency actions that merited judicial deference.

### III

The threshold question the Court addresses today is the kind of "pure question of statutory construction for the courts to decide" that we answered in *Cardoza-Fonseca*, *id.,* at 446, rather than a fact-intensive question of the kind we addressed in *Aguirre-Aguirre*.  Just as we decided

the narrow legal question presented in *Cardoza-Fonseca* but did not "attempt to set forth a detailed description of how the 'well-founded fear' test should be applied," 480 U. S., at 448, I would decide the narrow legal question now before us and remand for the agency to determine how the persecutor bar applies in individual cases.[5]

For reasons similar to those set forth in my dissent in *Fedorenko*, I think it plain that the persecutor bar does not disqualify from asylum or withholding of removal an alien whose conduct was coerced or otherwise the product of duress. Although I agree in full with the Court's conclusion that the majority opinion in *Fedorenko* does not govern our interpretation of the persecutor bar, the differences the Court highlights between the Displaced Persons Act of 1948 (DPA), 62 Stat. 1009, and the Refugee Act of 1980, 94 Stat. 102, only strengthen my conclusion that *voluntary* assistance in persecution is required and that duress and coercion vitiate voluntariness.

The *Fedorenko* Court's construction of the DPA threatened to exclude from the United States concentration camp prisoners who were forced to assist the Nazis in the

———————

[5]The majority suggests that this approach is inconsistent with the "'ordinary "remand" rule'" articulated in *Gonzales* v. *Thomas*, 547 U. S. 183 (2006) *(per curiam)*, and *INS* v. *Orlando Ventura*, 537 U. S. 12 (2002) *(per curiam)*. *Ante,* at 11–12. But those cases involved exactly the sort of application of law to fact that is within the agency's purview. In *Thomas*, the Court of Appeals decided that the family at issue "fell within the scope of the statutory term 'particular social group.'" 547 U. S., at 185. We noted that the BIA had not considered this question, which "require[d] determining the facts and deciding whether the facts as found f[e]ll within a statutory term." *Id.*, at 186. Accordingly, we held that the court should have remanded to the agency. Similarly, in *Ventura*, the Court of Appeals addressed an issue that the BIA had not reached and concluded that conditions in Guatemala had so improved that no realistic threat of persecution currently existed. The Government argued that the court had not respected "the BIA's role as fact-finder," 537 U. S., at 16, and we agreed, reversing the court's judgment insofar as it had not remanded to the agency.

persecution of other prisoners. In my view, this construc-
tion was insupportable—the DPA's exclusion of persons
who "assisted the enemy in persecuting civil populations,"
Constitution of the International Refugee Organization,
Annex I, Part II, §2*(a)*, 62 Stat. 3051, did not extend to
concentration camp prisoners who did so involuntarily.
These prisoners were victims, not persecutors.

Without an exception for involuntary action, the Refu-
gee Act's bar would similarly treat entire classes of victims
as persecutors. The Act does not support such a reading.
The language of the persecutor bar is most naturally read
to denote culpable conduct, and this reading is powerfully
supported by the statutory context and legislative history.

As this Court has previously recognized—and as the
majority acknowledges again today—Congress passed the
Refugee Act to implement the United Nations Convention
Relating to the Status of Refugees, 189 U. N. T. S. 150
(July 28, 1951) (hereinafter Convention), reprinted in 19
U. S. T. 6259, and the 1967 United Nations Protocol Relat-
ing to the Status of Refugees, Jan. 31, 1967, [1968] 19
U. S. T. 6223, T. I. A. S. No. 6577 (hereinafter Protocol).
These treaties place a mandatory obligation on signatory
states not to "expel or return ('refouler') a refugee in any
manner whatsoever to . . . territories where his life or
freedom would be threatened on account of his race, relig-
ion, nationality, membership of a particular social group
or political opinion." Convention, Art. 33(1), 19 U. S. T., at
6276; Protocol, Art. I, 19 U. S. T., at 6225. The Refugee
Act's withholding of removal provision specifically tracks
this language. 8 U. S. C. §1231(b)(3)(A); see H. R. Rep.
No. 96–608, p. 18 (1979) (withholding of removal provision
"clearly reflects our legal obligations under international
agreements," specifically Convention Article 33).[6]

---

[6] Asylum and withholding of removal address concerns different from
those addressed by the Convention Against Torture and Other Cruel,

The Convention excludes from the *nonrefoulement* obligation of Article 33 persons who have "committed a crime against peace, a war crime, or a crime against humanity." Convention, Art. 1(F)*(a)*, 19 U. S. T., at 6263. It is this exception that the persecutor bar reflects. See, *e.g.*, H. R. Rep. No. 96–608, at 18 (persecutor bar encompasses "exceptions . . . provided in the Convention relating to aliens who have themselves participated in persecution"); H. R. Conf. Rep. No. 96–781, p. 20 (1980). The language of the Convention's exception is critical: We do not normally convict individuals of *crimes* when their actions are coerced or otherwise involuntary. Indeed, the United Nations Handbook, to which the Court has looked for guidance in the past, states that all relevant factors, including "mitigating circumstances," must be considered in determining whether an alien's acts are of a "criminal nature" as contemplated by Article 1(F). Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status ¶¶157, 162 (reedited Jan. 1992). Other states parties to the Convention and Protocol likewise read the Convention's exception as limited to culpable conduct.[7] When we

―――――――――

Inhuman, or Degrading Treatment or Punishment (CAT) and its implementing regulations. CAT, Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U. N. T. S. 85; 8 CFR §§1208.16–1208.18 (2008). The CAT prohibits a state party from returning any person to a country where there is substantial reason to believe he might be tortured, but its definition of torture covers a narrower class of harms, imposed by a narrower class of actors, than the asylum and witholding of removal provisions. Most importantly, the CAT limits its definition of torture to acts "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity," Pt. I, Art. 1, ¶1, p. 19, while asylum and withholding of removal are available to victims of harm inflicted by private actors, without regard to state involvement, see, *e.g.*, *In re Kasinga*, 21 I. & N. Dec. 357, 365 (BIA 1996); *In re H—*, 21 I. & N. Dec. 337, 343–344 (BIA 1996).

[7] See, *e.g.*, *Canada* v. *Asghedom*, [2001] F. C. T. 972, ¶28 (Can. Fed. Ct.); *Gurung* v. *Secretary of State for Home Dept.*, [2002] UKIAT 4870,

interpret treaties, we consider the interpretations of the courts of other nations, and we should do the same when Congress asks us to interpret a statute in light of a treaty's language. See *Zicherman* v. *Korean Air Lines Co.*, 516 U. S. 217, 226–228 (1996). Congress' effort to conform United States law to the standard set forth in the U. N. Convention and Protocol shows that it intended the persecutor bar to apply only to culpable, voluntary acts—and it underscores that Congress did not delegate the question presented by this case to the agency.

While I would hold that the persecutor bar does not automatically disqualify from asylum or withholding of removal an alien who acted involuntarily,[8] I would leave for the Attorney General—and, through his own delegation, the BIA—the question how the voluntariness standard should be applied. The agency would retain the ability, for instance, to define duress and coercion; to determine whether or not a balancing test should be employed; and, of course, to decide whether any individual asylum-seeker's acts were covered by the persecutor bar. Those are the sorts of questions suited to the agency's unique competencies in administering the INA. The threshold question before the Court is not.

—————

¶¶108–110 (U. K. Immigr. App. Trib.); *SRYYY* v. *Minister for Immigration & Multicultural & Indigenous Affairs*, [2005] 147 F. C. R. 1, ¶¶126–128 (Austl. Fed. Ct.); Refugee Appeal No. 2142/94, pp. 12–14 (N. Z. Refugee Status App. Auth., Mar. 20, 1997). Notions of culpability have deep roots in asylum law. See generally 2 H. Grotius, De Jure Belli ac Pacis Libri Tres ch. XXI, §V(1), p. 530 (J. Scott ed., F. Kelsey et al. transl., 1925) ("[P]laces of asylum were available [in ancient times] for those from whose hands a chance missile had slain a man" and for those with "innocent" minds).

[8] Other considerations that are not presented in this case, such as an alien's lack of knowledge that he was involved in a persecutory act, could likewise indicate that he did not act with the requisite culpability. See, *e.g.*, *Castañeda-Castillo* v. *Gonzales*, 488 F. 3d 17, 20–22 (CA1 2007) (en banc); *Hernandez* v. *Reno*, 258 F. 3d 806, 814 (CA8 2001).

IV

Because I remain convinced that the narrower interpretation of *Chevron* endorsed by the Court in *Cardoza-Fonseca* was more faithful to the rationale of that case than the broader view the Court adopts today, I am unable to join its opinion. I would answer the question of law that this case presents with an unequivocal "no" and remand to the agency for further proceedings.

# SUPREME COURT OF THE UNITED STATES

No. 07–499

DANIEL GIRMAI NEGUSIE, PETITIONER *v.* ERIC
H. HOLDER, JR., ATTORNEY GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[March 3, 2009]

JUSTICE THOMAS, dissenting.

The "persecutor bar" in the Immigration and Nationality Act (INA) denies asylum and the withholding of removal to any alien who has "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U. S. C. §§1101(a)(42), 1158(b)(2)(A), 1231(b)(3)(B)(i). The Board of Immigration Appeals (BIA), principally relying on this Court's decision in *Fedorenko* v. *United States*, 449 U. S. 490 (1981), held that the statute does not require that the persecution be voluntarily inflicted. The Court of Appeals for the Fifth Circuit affirmed.

According to the Court, *Fedorenko*, which construed the similar text of a persecution bar in the Displaced Persons Act of 1948 (DPA), is largely irrelevant to the question presented here. See *ante*, at 6–8, 9–10; see also *ante*, at 2 (SCALIA, J., concurring). The majority further holds that the INA is ambiguous as to "whether coercion or duress is relevant in determining if an alien assisted or otherwise participated in persecution" and that the agency, therefore, should interpret the statute in the first instance to determine whether it reasonably can be read to include a voluntariness requirement. *Ante*, at 5, 10–12; see also *ante*, at 1 (SCALIA, J., concurring). I disagree with both of

these conclusions. Because the INA unambiguously precludes any inquiry into whether the persecutor acted voluntarily, *i.e.*, free from coercion or duress, I would affirm the judgment of the Court of Appeals. I respectfully dissent.

I

Petitioner Daniel Girmai Negusie testified to the Immigration Judge (IJ) that he was forced to work as an armed guard for four years at an Eritrean prison camp where prisoners were persecuted because of their religious beliefs. According to petitioner, part of his job was "to firmly control the prisoners, to punish the prisoners, too, by exposing them" to the extreme heat of the African sun. App. 58. The guards "would . . . hold [a] stick [with] their hand" and follow prisoners who were being forced to "roll on the ground in the sun." *Id.*, at 23. Because "it was extremely hot," prisoners would quickly "get tired and [feel] shortness of breath and stop" rolling. *Id.,* at 24. They were then beaten. Prisoners typically could not survive this punishment for more than two hours. Indeed, at least one prisoner died from sun exposure while petitioner stood guard. See *ante*, at 3 (majority opinion).

Petitioner testified that, as a guard, he prevented the prisoners from showering and forbade them from leaving their rooms for fresh air. This form of punishment was particularly severe because the prisons were "built from stone and bricks" with "no cooling system, no ventilation, no windows," and intolerable heat. App. 20, 30. Petitioner also prevented prisoner escapes, for which the punishment was forced sun exposure. And, although petitioner never used "electricity to torture" prisoners, he was aware that his supervisor did. *Id.,* at 61–62.

But petitioner, who had converted to Protestantism when he was confined as a prisoner at the camp, also testified that he did not want to persecute any of the

prisoners because his new religion taught him "to be merciful." *Id.,* at 34. Thus, at times he disobeyed his orders. On one occasion, he gave water to a prisoner who was dying from sun exposure. On another occasion, he let female prisoners take showers after they had been denied that privilege "for a long time." *Id.,* at 37. Petitioner also occasionally allowed some of the prisoners to "go outside during the night and during the evenings and . . . refresh themselves in the fresh air." *Id.,* at 37–38.

After four years as a prison guard, petitioner deserted his post, swam to a shipping container, and hid inside. See *ante*, at 3 (majority opinion). The container arrived in the United States with petitioner inside on December 20, 2004. Petitioner applied for asylum and the withholding of removal under the INA, 8 U. S. C. §1101 *et seq.* He also applied for protection under the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (CAT), under which it is "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." Foreign Affairs Reform and Restructuring Act of 1998, §2242(a), 112 Stat. 2681–822, note following 8 U. S. C. §1231, p. 263 (United States Policy with Respect to Involuntary Return of Persons in Danger of Subjection to Torture (hereinafter CAT Policy)). See also CAT, Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U. N. T. S. 85. Petitioner feared that, if returned to Eritrea, he would "be executed" because he had converted to Protestantism and deserted his military post. App. 65, 68.

The INA provides the Executive with the discretion to grant asylum to aliens that are "unable or unwilling" to return to their home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group,

or political opinion." 8 U. S. C. §§1101(a)(42)(A),
1158(b)(1). The INA also requires the Executive to with-
hold removal of aliens to a country in which there is a
"clear probability" that their "life or freedom would be
threatened" because of their "race, religion, nationality,
membership in a particular social group, or political opin-
ion." §1231(b)(3)(A). However, the INA prohibits the
Executive from granting asylum or withholding removal if
an alien "ordered, incited, assisted, or otherwise partici-
pated in the persecution" of any person on account of
"race, religion, nationality, membership in a particular
social group, or political opinion." §1158(b)(2)(A)(i) (asy-
lum); §1231(b)(3)(B) (withholding of removal). Nonethe-
less, in light of the CAT's requirement that "[n]o State
Party shall . . . return . . . a person to another State where
there are substantial grounds for believing that he would
be in danger of being subjected to torture," Art. 3, S.
Treaty Doc. No. 100–20, at 20, regulations implementing
that convention provide "deferral of removal" to aliens
subject to the INA persecutor bar who would more likely
than not be tortured if removed to their home country.[1] 8
CFR §§1208.16(c)(4), (d)(2), 1208.17(a) (2008); see also
CAT Policy (b), at 263 (requiring federal agencies to "pre-
scribe regulations to implement the obligations of the
United States under Article 3 of the [CAT], subject to any
reservations, understandings, declarations, and provisos

———————

[1] "Deferral of removal" was created to accommodate Congress' direc-
tion to exclude those who fall within the INA persecutor bar "[t]o the
maximum extent consistent with the obligations of the United States
under the [CAT]" to not return an alien to a country in which he or she
will be tortured. CAT Policy (c), at 263. To accomplish that goal,
deferral of removal provides "a less permanent form of protection than
withholding of removal and one that is more easily and quickly termi-
nated if it becomes possible to remove the alien consistent with Article
3" of the CAT, 64 Fed. Reg. 8480 (1999), while also "ensur[ing] that
[such aliens] are not returned to a country where they would be tor-
tured," *id.,* at 8481.

contained in the United States Senate resolution of ratification of the Convention").

The IJ denied petitioner's applications for asylum and the withholding of removal, but granted him deferral of removal. The BIA affirmed. In their view, petitioner's conduct objectively qualified as assistance or participation in the persecution of others based on religion. See *ante*, at 3 (majority opinion). Relying on *Fedorenko*, the IJ and BIA found that even if petitioner was "compelled to participate as a prison guard" against his wishes, his "motivation and intent are irrelevant to the issue of whether he 'assisted' in persecution." *Ibid.* (some internal quotation marks omitted). Therefore, petitioner was ineligible for asylum or the withholding of removal under the INA. The IJ and BIA agreed, however, that petitioner qualified for deferral of removal because it is "more likely than not that he would be tortured" if returned to Eritrea given that its "government has used deadly force and threatened to use deadly force against deserters." App. to Pet. for Cert. 7a–8a, 20a, 19a. The Court of Appeals affirmed. See *Negusie* v. *Gonzales*, 231 Fed. Appx. 325, 326 (CA5 2007) *(per curiam).*

## II

As with all statutory interpretation questions, construction of the INA's persecutor bar must begin with the plain language of the statute. See *Jimenez* v. *Quarterman*, 555 U. S. ___, ___ (2009) (slip op., at 5) (citing *Lamie* v. *United States Trustee*, 540 U. S. 526, 534 (2004)). If the text of a statute governing agency action "'directly addresse[s] the precise question at issue,'" then, "'that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *National Assn. of Home Builders* v. *Defenders of Wildlife*, 551 U. S. 664, ___ (2007) (slip op., at 18) (quoting

*Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984)).

A

A court must first "look to the particular statutory language at issue." *K mart Corp.* v. *Cartier, Inc.*, 486 U. S. 281, 291 (1988). As the majority acknowledges, see *ante*, at 5–6, the text of the INA's persecutor bar neither includes the term "voluntary" nor contains an exception for involuntary, coerced conduct. The statute instead applies to *any* alien "who ordered, incited, assisted, or otherwise participated in the persecution of any person" on account of a protected ground. §§1101(a)(42), 1158(b)(2)(A)(i), 1231(b)(3)(B)(i).

The statute's key terms also do not imply any voluntariness requirement for persecution. Under the ordinary meaning of the term "persecution" at the time of the statute's enactment in 1980 and its reenactment in 1996, the act of persecution alone is sufficient to classify one's conduct as persecution. See Webster's Ninth New Collegiate Dictionary 877 (1991) (hereinafter Webster's Ninth) (defining "persecution" as "the act or practice of persecuting esp. those who differ in origin, religion, or social outlook"); see also Webster's New Collegiate Dictionary 855 (1975) (hereinafter Webster's) (same). The term itself includes no intrinsic *mens rea* requirement. As a result, an individual can "persecute"—meaning "harass in a manner designed to injure, grieve, or afflict"—without having designed the act or intended for injury, grief, or affliction to occur. Webster's Ninth 877; see also Webster's 855 (same).

The persecutor bar's inclusion of those who "assist" or "participate" confirms that it does not include a voluntariness requirement. The term "assist" is defined as "to give support or aid," Webster's Ninth 109, or "to help," Oxford American Dictionary 36 (1980) (hereinafter Oxford). See also Black's Law Dictionary 111 (5th ed. 1979) (hereinaf-

ter Black's) (defining "assist" as "[t]o help; aid; succor; lend countenance or encouragement to; participate in as an auxiliary"). And "participate" means simply "to take part," Webster's Ninth 858, or "to have a share, to take part in something," Oxford 487; see also Black's 1007 (defining "participate" as "[t]o receive or have a part or share of; to partake of; experience in common with others; to have or enjoy a part or share in common with others"). Accordingly, this Court has concluded that the ordinary meanings of "assist" and "participate" do not "connote voluntariness." *Pennsylvania Dept. of Corrections* v. *Yeskey*, 524 U. S. 206, 211 (1998) (participate); see also *Fedorenko*, 449 U. S., at 512 (assist). These are "terms and concepts of breadth," *Russello* v. *United States*, 464 U. S. 16, 21–22 (1983), that require only that an individual take "*some* part in" an activity, or help it to occur in some way. *Reves* v. *Ernst & Young*, 507 U. S. 170, 178–179 (1993) (emphasis in original). Even if participation or assistance is coerced, it remains participation or assistance just the same.

## B

In addition to the particular statutory section of the INA before the Court, "the language and design of the statute as a whole" is instructive in determining the provision's plain meaning. *K mart Corp., supra*, at 291; see also *Amoco Production Co.* v. *Gambell*, 480 U. S. 531, 552–553 (1987). Here, the INA's design and structure buttress the conclusion that the persecutor bar applies irrespective of voluntariness.

First, Congress has evidenced its ability to both specifically require voluntary conduct and explicitly exclude involuntary conduct in other provisions of the INA. See *infra*, at 15–16. For example, Congress has barred admission to the United States of totalitarian party members unless their membership was "involuntary," 8 U. S. C.

§1182(a)(3)(D)(ii), and it has provided for the termination of asylum when an alien "has voluntarily availed himself or herself" of another country's protections, §1158(c)(2)(D). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello, supra*, at 23 (internal quotation marks omitted); see, *e.g.*, *Barnhart* v. *Sigmon Coal Co.*, 534 U. S. 438, 452–454 (2002). The absence of a voluntariness requirement in the INA persecutor bar is no exception.

Second, federal immigration law provides calibrated remedies, which include partial refuge for specified aliens who have both suffered from and inflicted persecution. Those who have been persecuted and have not engaged in persecution may receive both asylum and the withholding of removal. §§1231(b)(3)(A), 1158(b)(1)(A). Those at the other end of the spectrum, who have not been persecuted but have persecuted others, may not receive either asylum or the withholding of removal. §§1231(b)(3)(B)(i), 1158(b)(2)(A)(i). And finally, for many individuals who (like petitioner) have both persecuted others and been persecuted, the scheme provides temporary refuge; they will receive deferral of removal under the CAT if they will face torture upon their return to their home country. CAT Policy (a), at 263; see also 8 CFR §§1208.13(a), 1208.16(d)(2).

Where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions," courts should not read one part of the legislative regime (the INA) to provide a different, and conflicting, solution to a problem that has already been specifically addressed elsewhere in the federal immigration regime (regulations implementing the CAT). *Varity Corp.* v. *Howe*, 516 U. S. 489, 519 (1996) (THOMAS, J.,

dissenting); see also *Transamerica Mortgage Advisors, Inc.* v. *Lewis*, 444 U. S. 11, 19 (1979). Federal law provides only partial protection to a victim of persecution who has also engaged in persecution, voluntarily or not. There simply is no justification for writing into the INA's persecutor bar the greater protections of asylum and the withholding of removal for individuals who were coerced into engaging in persecution. That is, the "assumption of inadvertent omission" of a voluntariness requirement in the INA "is rendered especially suspect upon close consideration of [a statute's] interlocking, interrelated, and interdependent remedial scheme" that addresses the specific problem at issue in a conflicting way. *Massachusetts Mut. Life Ins. Co.* v. *Russell*, 473 U. S. 134, 146–147 (1985).[2]

## C

Finally, Congress is aware of a judicial interpretation of statutory language and "adopt[s] that interpretation when it re-enacts a statute without change." *Lorillard* v. *Pons*, 434 U. S. 575, 580 (1978); see also *Traynor* v. *Turnage*, 485 U. S. 535, 546 (1988); 2B N. Singer & J. Singer, Sutherland on Statutory Construction §49.9, pp. 127–133 (7th

---

[2] It also is important to acknowledge that the object of the INA is to codify Congress' policy decisions " 'pertaining to the entry of aliens and their right to remain' " in the United States—decisions that are " 'entrusted exclusively to Congress.' " *Kleindienst* v. *Mandel*, 408 U. S. 753, 766, 767 (1972) (quoting *Galvan* v. *Press*, 347 U. S. 522, 531–532 (1954)). In fact, "over no conceivable subject is the legislative power of Congress more complete than it is over" the decision of Congress to admit or to exclude aliens. *Oceanic Steam Nav. Co.* v. *Stranahan*, 214 U. S. 320, 339 (1909). Courts therefore must enforce the immigration policy decision reflected in a statute's plain terms, even if Congress has chosen "to forbid the entrance of foreigners within its dominions" altogether, *Fong Yue Ting* v. *United States*, 149 U. S. 698, 705 (1893). Likewise, here, where Congress has made a judgment about which persons to admit and exclude from the country, it is not for this Court to question the wisdom of that choice.

ed. 2008). Here, the statutory and decisional backdrop against which Congress enacted the INA's persecutor bar counsels against grafting a voluntariness requirement onto the statute.

When Congress enacted the INA's persecutor bar, it essentially retained the language used in similar predecessor statutes. Under the 1948 DPA persecutor bar, entry was denied to all who "'assisted the enemy in persecuting civil[ians].'" *Fedorenko*, 449 U. S., at 495 (quoting 62 Stat. 3051). In 1950, Congress added a second persecutor bar to the DPA that applied "to any person who advocated or assisted in the persecution of any person because of race, religion, or national origin." §13, 64 Stat. 227. In the years that followed, Congress continued to use this same broad language in denying asylum to specific categories of persecutors. See, *e.g.*, §105, 91 Stat. 1224 (denying permanent residence to aliens from Vietnam, Laos, and Cambodia "who ordered, assisted, or otherwise participated in the persecution of any person because of race, religion, or political opinion"); 8 U. S. C. §§1182(a)(3)(E), 1227(a)(4)(D)) (authorizing the exclusion of anyone who had been associated with Nazi forces and had "ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion"); §14(a), 67 Stat. 406 (imposing persecutor bar on "any person who personally advocated or assisted in the persecution of . . . [a] group of persons because of race, religion, or national origin").

Congress then enacted the INA bar in 1980. This statute comprehensively labeled as a persecutor "any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." §201(a), 94 Stat. 102–103. Congress reenacted the INA's persecutor bar in 1996 and retained its breadth. See Illegal Immigration Reform and Immi-

grant Responsibility Act of 1996 (IIRIRA), §§305(b)(3)(B)(i), 601(a)(1), 604(b)(2)(A)(i), 110 Stat. 3009–602, 689, 691.

Congress' uninterrupted use of this broad statutory language, which parallels the persecutor bars dating back to 1948, was not accidental. By the time of the 1996 reenactment, this Court had specifically interpreted the plain language of the predecessor bars to apply regardless of the voluntariness of a persecutor's conduct. See *Fedorenko, supra*, at 512 (1948 DPA bar); see also *United States* v. *Koreh*, 59 F. 3d 431, 439 (CA3 1995) (1950 DPA bar); *United States* v. *Schmidt*, 923 F. 2d 1253, 1258 (CA7 1991) (1948 DPA bar); *Maikovskis* v. *INS*, 773 F. 2d 435, 445–446 (CA2 1985) (8 U. S. C. §1251(a)(19) (1982 ed.), transferred to §1227(a)(4)(D) (2006 ed.)). In particular, this Court had held that the phrase in the 1948 DPA bar, "assisted the enemy in persecuting civil[ians]," contained no "'involuntary assistance' exception." *Fedorenko,* 449 U. S., at 512. Rather, the statute's "plain language" made clear that "an individual's service as a concentration camp armed guard—whether voluntary or involuntary—made him ineligible for a visa." *Ibid.*

In light of this legal backdrop, Congress' decisions in 1980 and 1996 to retain a persecutor bar that broadly applies to anyone who "assisted, or otherwise participated in the persecution" of any person, §§1158(b)(2)(A)(i), 1231(b)(3)(B), is significant evidence that Congress did not intend to include any involuntariness exception in the INA bar. This Court must assume, absent textual proof to the contrary, that Congress was aware of the *Fedorenko* decision when it reenacted the persecutor bar and thus "adopt[ed] that interpretation when it re-enact[ed the] statute without change," *Lorillard, supra,* at 580.

## D

In sum, the INA's persecutor bar does not require that

assistance or participation in persecution be voluntary or
uncoerced to fall within the statute's reach. It instead
"mandates precisely" what it says: "[A]n individual's ser-
vice as a [prison] camp armed guard—whether voluntary
or involuntary—ma[kes] him ineligible for" asylum or
withholding of removal if the guard's service involved
assistance or participation in the persecution of another
person on account of a protected ground. *Fedorenko,
supra*, at 512. Here, it is undisputed that petitioner
served at a prison camp where guards persecuted prison-
ers because of their religious beliefs. See *ante*, at 2–3
(majority opinion). It also is undisputed that petitioner
carried out the persecution by preventing prisoners from
escaping and by standing guard while at least one pris-
oner died from sun exposure. *Ibid.* Petitioner, therefore,
"assisted, or otherwise participated" in persecution and
thus is statutorily disqualified from receiving asylum or
withholding of removal under the INA. [3]

————————

[3] JUSTICE STEVENS also finds the language of the INA's persecutor bar
"plain," but concludes that it must incorporate a culpability require-
ment because the statute applies to those whose "acts are of a 'criminal
nature.'" See *ante*, at 7, 9 (opinion concurring in part and dissenting in
part). I disagree. The decision to admit an alien is a matter of legisla-
tive grace, see n. 2, *supra*, for which judicial review has been "consis-
tently classified" as civil in nature, *Harisiades* v. *Shaughnessy*, 342
U. S. 580, 594 (1952); see also *Zadvydas* v. *Davis*, 533 U. S. 678, 720
(2001) (KENNEDY, J., dissenting) (explaining that "'an alien seeking
initial admission to the United States requests a privilege and has no
constitutional rights regarding his application, for the power to admit
or exclude aliens is a sovereign prerogative'" (quoting *Landon* v.
*Plasencia*, 459 U. S. 21, 32 (1982))). There is no warrant to read
criminal-law requirements into a statute that is "nonpunitive in pur-
pose and effect." *Zadvydas, supra*, at 690. Further, the conclusory
pronouncement in the Office of the United Nations High Commissioner
for Refugees' Handbook on Procedures and Criteria for Determining
Refugee Status ¶162 (reedited Jan. 1992), that "it has to be assumed,
although this is not specifically stated, that the acts covered by the
present clause must also be of a criminal nature," is insufficient to
require criminal proof to deny withholding of removal, contra, *ante*, at

### III

The majority nevertheless concludes the statute's "silence," *ante,* at 6, creates ambiguity, and therefore remands the case to the BIA for it to determine, in the first instance, whether persecution must be voluntary to fall within the terms of the INA's persecutor bar. "The Court's efforts to derive ambiguity from th[e] utmost clarity" of the persecutor bar, however, "are unconvincing" in every respect. *INS* v. *St. Cyr*, 533 U. S. 289, 329 (2001) (SCALIA, J., dissenting).

The majority principally finds ambiguity in the statutory text because it does not include either the word "voluntary" or the word "involuntary." See *ante*, at 7. But a statute cannot be deemed ambiguous until the court "exhaust[s] the aid of the 'traditional tools of statutory construction'" and determines that Congress did not resolve the issue under consideration. *Clark* v. *Martinez*, 543 U. S. 371, 402 (2005) (THOMAS, J., dissenting) (quoting *Chevron*, 467 U. S., at 843, n. 9). Deeming a statute with broad terms to be ambiguous for that reason alone essentially requires Congress either to obey a judicially imposed clear-statement rule or accept the risk that the courts may refuse to give full effect to a statute's plain meaning in the name of *Chevron* deference. Not every difficult question of statutory construction amounts to a statutory gap for a federal  agency to fill. See *ante*, at 1–4 (opinion of STEVENS, J.). And the Court should not, "in the name of deference, abdicate its responsibility to interpret a statute" simply because it requires some effort. *Global Crossing Telecommunications, Inc.* v. *Metrophones Telecommunications, Inc.*, 550 U. S. 45, 77 (2007) (THOMAS, J., dissenting).

---

9–10 (opinion of STEVENS, J.). The United Nations handbook "is not binding on the Attorney General, the BIA, or United States courts." *INS* v. *Aguirre-Aguirre*, 526 U. S. 415, 427 (1999).

The majority makes no attempt to apply the "traditional
tools of statutory construction" to the persecutor bar be-
fore retreating to ambiguity. See *ante*, at 5–6. Rather, it
merely observes that Congress could have spoken more
directly to the issue, which it finds sufficient to render the
statute ambiguous on this score. *Ante*, at 6. But the
absence of a phrase specifying that the provision applies to
both involuntary and voluntary conduct is not definitive
proof of ambiguity. It is certainly correct that Congress
"'could have spoken in clearer terms,'" *Clark*, 543 U. S., at
402 (THOMAS, J., dissenting), as it almost always can in
any statute. However, this "proves nothing" in evaluating
whether the statute is ambiguous. *Ibid.* The question
before the Court instead is whether Congress has provided
an unambiguous answer in the plain language that it
chose to use. Here, for the reasons just explained, the
traditional tools of statutory interpretation show with
"utmost clarity," *St. Cyr, supra*, at 329, that the statute
applies regardless of the voluntariness of the alien who
participates or assists in persecution.[4]

The majority also finds ambiguity based on differences
between the INA and the DPA statutory bar considered in
*Fedorenko*. In particular, the majority points to the *Fe-
dorenko* Court's reliance on a second part of the DPA
persecutor bar, which applied to those who "'*voluntarily*

―――――――

[4] Because this Court should not delegate the interpretation of the
persecutor bar's plain meaning to a federal agency, see *Board of Gover-
nors, FRS* v. *Dimension Financial Corp.*, 474 U. S. 361, 368 (1986), it is
largely irrelevant whether the BIA properly relied on *Fedorenko* v.
*United States,* 449 U. S. 490 (1981), in interpreting the statute, see
*ante*, at 9–11 (majority opinion); *ante*, at 2 (SCALIA, J., concurring). In
any event, the BIA's construction of the INA's persecutor bar correctly
reflected the text of the provision. There is no reason to remand the
question to the agency when only one construction of the statute is
permissible and the agency's original decision adopted that proper
construction. See *National Cable & Telecommunications Assn.* v.
*Brand X Internet Services*, 545 U. S. 967, 982–985 (2005).

assisted the enemy forces . . . in their operations against the United Nations.'"  449 U. S., at 495, and n. 3 (quoting 62 Stat. 3052; emphasis added).  The Court noted that "[u]nder traditional principles of statutory construction, the deliberate omission of the word 'voluntary' from §2(a)," which addressed the assistance of persecution—but not from §2(b)—"compel[led] the conclusion that the statute made *all* those who assisted in the persecution of civilians ineligible for visas."  *Id.,* at 512.  According to the majority, because the INA persecutor bar, unlike the DPA bar, does not include a provision limited by the word "voluntarily" adjacent to the provision that is not so limited, the absence of the adverb here cannot carry the significance given it in *Fedorenko.*  See *ante*, at 7.

The majority's reasoning is flawed. The mere fact that the INA's persecutor bar is not accompanied by a neighboring provision containing the word "voluntarily" does not negate the significance of the term's absence when other INA provisions are explicitly limited to actions undertaken voluntarily.  As noted above, see *supra,* at 7, the INA imposes a voluntariness requirement in a host of statutory provisions, see, *e.g.*, 8 U. S. C. §1158(c)(2)(D) (terminating asylum when alien has "voluntarily" availed himself of the protection of his country); §§1182(a)(3)(D)(i)–(ii) (denying admission and naturalization to those who have been members of, or affiliated with, "the Communist or any other totalitarian party" unless that membership or affiliation was "involuntary"); §1182(d)(3)(B)(i) (denying admission to those who have "voluntarily and knowingly" engaged in, endorsed, espoused, or persuaded others to endorse, espouse, or support terrorist activity); §1229c(a)(1) (allowing an alien to "voluntarily" depart the United States); §§1424(a), (d) (precluding naturalization for members of certain totalitarian parties, unless membership was "involuntary"); §1481(a) (providing for loss of nationality by "voluntarily"

performing certain specified acts with the intention of relinquishing nationality).[5]

In the immigration and naturalization context, then, Congress is certainly capable of declaring its preference for a voluntariness requirement. That Congress' explicit references to voluntariness appear in other sections of this particular statutory scheme, rather than in subsections of §§1158 or 1231, is immaterial. Cf. *Rusello,* 464 U. S., at 23; *Barnhart*, 534 U. S., at 452–454. And the fact that Congress, in the course of making structural revisions to the statutory regime, eliminated the specific dichotomy the Court noted in *Fedorenko* does not undermine the critical point: The INA expressly includes a voluntariness requirement in several places but does not impose such a requirement in the persecution bar. Thus, the omission of the word "voluntarily" from the persecutor bar in the INA is just as conclusive as its omission from the persecutor bar in the DPA. With respect to both statutes, the deliberate omission "compels the conclusion that the statute made *all* those who assisted in the persecution of civilians ineligible for visas." 449 U. S., at 512.

Finally, the majority concludes that the DPA bar is distinguishable from the INA bar because the former was enacted in the context of the ""'crime against humanity that [was] involved in the concentration camp,"'" which was so horrific that it is in a category all its own. *Ante*, at

———————

[5] Moreover, in the Refugee Act of 1980, which added the persecutor bar to the INA, Congress separately codified its desire to "promote opportunities for resettlement or voluntary repatriation." §101(a), 94 Stat. 102, note following 8 U. S. C. §1521. In 1996, when Congress reenacted the statutory text, it retained the persecution bar's broad language while again restricting other sections to voluntary conduct. See IIRIRA, §304, 110 Stat. 3009–587 (relating to "voluntary departure"), §402, *id.,* at 3009–656 (relating to "voluntary" participation in pilot programs for confirming employment eligibility), §604, *id.,* at 3009–690 (providing for termination of asylum when alien "voluntarily" takes certain actions).

8 (quoting *Fedorenko, supra*, at 511, n. 32). In that unique context, the majority reasons, it made sense to exclude "even those involved in nonculpable, involuntary assistance in Nazi persecution." *Ibid.* But the majority cannot intend to suggest that all acts of persecution during the Second World War were inherently more depraved or reprehensible than all acts of persecution that have occurred in the decades since the INA's enactment.

Certainly, no such conclusion is compelled by the statutory text. Congress has steadfastly condemned *all* acts of persecution. See 22 U. S. C. §§6401(a)(5)–(7) (noting that "Congress has recognized and denounced acts of religious persecution," which can be "severe and violent" and "particularly widespread, systematic, and heinous under totalitarian governments and in countries with militant politicized religious majorities"); §6401(b)(5) (announcing that it is the "policy of the United States" to "stan[d] with the persecuted"); §501, 78 Stat. 1015 ("The Congress condemns the persecution of any persons because of their religion"); Refugee Act of 1980, §101(a), 94 Stat. 102 ("The Congress declares that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands"). There is no reason to deny the INA persecutor bar its full meaning based on a speculative assumption that Congress, in 1980, could not have meant to oppose persecution quite as intensely as it did in the aftermath of World War II. Rather, the INA's persecutor bar naturally extends to all acts of persecution and, therefore, requires the denial of asylum and withholding of removal for "even those involved in nonculpable, involuntary assistance in . . . persecution." *Ante,* at 8 (majority opinion).

## IV

Because I conclude that the INA's persecutor bar applies whether or not petitioner's assistance or participation in

persecution was voluntary, and because it is conceded that petitioner assisted and participated in persecution while serving as an armed prison guard in Eritrea, I would affirm the decision of the Court of Appeals. Accordingly, I respectfully dissent.